Gerard Hartzog v. Commissioner.
Hartzog v. Commissioner
Docket No. 95211.
United States Tax Court
T.C. Memo 1965-24; 1965 Tax Ct. Memo LEXIS 306; 24 T.C.M. (CCH) 100; T.C.M. (RIA) 65024; February 10, 1965
*306 Respondent failed to prove that taxpayer's returns for 1946, 1947, and 1948 were false and fraudulent with intent to evade tax. Assessment and collection of deficiencies for those years barred by the statute of limitations. Gerard Hartzog, 911 Palmetto State Life Bldg., Columbia, S.C. and Elden McFarland, for the petitioner. Winfield A. Gartner, for the respondent. DRENNEN
Memorandum Findings of Fact and Opinion DRENNEN, Judge: Respondent determined deficiencies in petitioner's income tax and additions to tax under section 293(b), I.R.C. 1939, [1] as follows: Taxable
Addition
year
Deficiency
to tax
1946
$3,648.57
$1,824.29
1947
1,652.21
826.11
1948
3,004.08
1,502.04
The issues for decision are: 1. Whether assessment and collection of the deficiencies in tax and additions to tax for each of the years 1946, 1947, and 1948 is barred by the statute of limitations. Assessment and collection of the deficiencies for each of the years is admittedly barred unless the returns for those years were false or fraudulent with intent to evade tax. 2. Whether any part of any deficiency for the years 1946, 1947, and 1948 was due to fraud with intent to evade tax with the result that petitioner is liable for the addition to tax under *308 section 293(b). 3. Whether respondent erred in determining petitioner's net income to be $15,024.66, $9,263.91, and $14,484.78 for the years 1946, 1947, and 1948, respectively, rather than net losses of $2,259.32, $1,202.23, and $1,875.88 as reported by petitioner on his returns for those respective years. 4. Whether petitioner is entitled to additional dependency exemptions for the years involved, not claimed on his returns, for his brother and his brother's wife and three children. Respondent's determinations were based primarily (1) on petitioner's failure to report specific items of income in each of the years involved consisting, in 1946, of a payment of $15,500 petitioner received upon severance of his employment with Great Northern Railroad Co. and $135 in dividends, in 1947, of certain legal fees and proceeds from the sale of cotton, and, in 1948, of certain legal fees and proceeds from the sale of cotton; and (2) on petitioner's overstatement of expenses incurred in the practice of law for each of the years involved, and of expenses incurred in farming for each of the years 1946 and 1947. Petitioner was indicted for criminal tax evasion for each of the years here involved *309 and was tried on those charges before a jury in the U.S. District Court for the Eastern District of South Carolina in 1954. The jury returned a verdict of not guilty on count 1, involving the year 1946, and guilty on counts 2 and 3, involving the years 1947 and 1948, respectively. On appeal the U.S. Court of Appeals for the Fourth Circuit reversed the judgment of the District Court entered on the jury's verdict and remanded the case for further proceedings, on the ground that it was prejudicial error for the trial court to receive in evidence the workpapers of the revenue agent who had conducted the examination of petitioner's books and records and who was deceased at the time of the trial, and to permit the special agent who had also been involved in the investigation to introduce in evidence and testify from his workpapers, which were based almost entirely on the workpapers of the deceased revenue agent. In the course of its opinion the Court of Appeals stated that in its view the amount of certain cotton loans made by the Commodity Credit Corp. which had been included in petitioner's income for 1948 as cotton sales by respondent were not income to petitioner for the year 1948. The *310 opinion of the Court of Appeals, filed December 21, 1954, is reported, Hartzog v. United States, 217 F. 2d 706. Upon remand, the indictments against petitioner were dismissed. See United States v. Hartzog, an unreported case ( E.D.S.C. 1956, 56-2 U.S.T.C. par. 9713). The notice of deficiency in this proceeding was dated September 7, 1961. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioner is married and resides in Columbia, S.C. For the taxable years 1946, 1947, and 1948 he filed timely separate Federal income tax returns with the then collector of internal revenue for the district of South Carolina. Petitioner was born in Bamberg County, S.C., in 1904. He graduated from Wofford College in 1925 and from the University of South Carolina Law School in 1931, after which he was admitted to the South Carolina State bar. On November 20, 1933, he received an appointment as a special attorney in the Office of General Counsel, Bureau of Internal Revenue, Washington, D.C. On September 7, 1939, petitioner resigned from the General Counsel's office, Bureau of Internal Revenue, and accepted an appointment with the *311 Department of Justice, Tax Division, Washington, D.C. On November 30, 1943, he resigned from the Department of Justice and entered the private practice of law with a law firm in Washington, D.C. On September 30, 1944, petitioner was admitted to practice as an attorney before this Court. In 1945, upon the recommendation of a Washington tax attorney, petitioner was appointed assistant general counsel of Great Northern Railway Co. (hereinafter referred to as Great Northern) with offices in St. Paul, Minn. Under date of March 28, 1945, petitioner and Great Northern entered into an employment contract by which Great Northern agreed to employ petitioner as assistant general counsel with duties consisting primarily of handling litigation and consultations regarding tax matters. The employment contract was for a period of 2 years at a salary of $1,000 per month. At the time petitioner entered into the employment contract with Great Northern he was living in Arlington, Va. He moved from Virginia to St. Paul, Minn., to assume his duties with Great Northern, and his employment commenced on April 16, 1945. Petitioner began work on two tax cases for Great Northern, one of which involved litigation *312 before this Court. These cases were terminated apparently to the satisfaction of Great Northern, but certain differences arose in the course of petitioner's employment with Great Northern. Petitioner had hoped, anticipated, or understood that he would be appointed general counsel of Great Northern upon the retirement of the general counsel under whom he served. But on or about October 1, 1945, another attorney employed by Great Northern was appointed general counsel. In early November 1945, the newly appointed general counsel, Edwin C. Matthias (hereafter referred to as Matthias), informed petitioner that his services would no longer be required by Great Northern and that Matthias' plans for the legal department did not include him. Matthias also told petitioner that he would like to make some adjustment with him with respect to petitioner's employment contract under which he had come to St. Paul. Petitioner objected, stating that he liked it in Minnesota and did not want to leave. Finally, Matthias told petitioner that his work was unsatisfactory. Petitioner at the time, or at subsequent conferences, insisted to Matthias that he would perform his duties. Matthias insisted that he *313 would have to employ someone other than petitioner. Matthias obtained authority from the president of Great Northern to negotiate a settlement with petitioner. In about mid-December 1945 petitioner told Matthias that he would not cite a figure for the settlement of his employment contract until he went back to Washington and consulted with friends. Petitioner discussed the matter with friends or former associates and at one time considered asking for a settlement of $40,000. At some point during the negotiations for settlement, petitioner discussed with the tax accountant for Great Northern the matter of withholding by Great Northern of Federal income tax on any amounts which he might receive under a settlement agreement. The tax accountant believed that withholding on any amounts received by petitioner was required. Finally, the tax accountant or some other employee of Great Northern directed a telegram to the Bureau of Internal Revenue in Washington, D.C., requesting a ruling as to whether withholding of Federal income tax was required on amounts to be paid petitioner. The record does not indicate the contents of the inquiry or whether petitioner's name was given in the inquiry. *314 In accepting employment with Great Northern and during the period that he was employed by Great Northern petitioner gave up his law practice in Washington, D.C., and sold his home in Arlington, Va. He purchased another home in St. Paul, Minn. He considered that the termination of his employment by Great Northern caused him personal embarrassment and inconvenience. He possibly mentioned these factors to Matthias during the course of their discussions of a settlement of petitioner's employment contract. On some date in late December 1945, petitioner agreed to settle with Great Northern by accepting from Great Northern an amount equal to the total salary which would have been paid petitioner had he remained in Great Northern's employ for the entire 2-year period of the employment contract. This discussion took place in Matthias' office. Matthias thereupon called in a secretary and dictated a settlement agreement. When the secretary returned with the agreement typed, it was given to petitioner who left Matthias' office. Petitioner returned later the same day and signed the agreement in the presence of Matthias who signed it at the same time. The settlement agreement, designated "agreement *315 of mutual release," and dated December 27, 1945, with petitioner as first party, Great Northern as second party, and Matthias as third party, after making reference to the employment contract and the terms thereof, provided that the relationship between petitioner and Great Northern of employee and employer be terminated as of December 31, 1945, and that in consideration of the payment to petitioner by Great Northern of $16,500, $1,000 (less withholding and railroad retirement tax totaling $193.55) on or about December 31, 1945, and the balance of $15,500 on or about January 2, 1946, being the net amount due for the remaining period of said contract of March 28, 1945, after making withholdings and deductions required by law or authorized by the First Party, (except that, under a ruling from the Department of Internal Revenue, no withholding is made from amount paid January 2, 1946) and in constderation of the payment of said sum in accordance with the terms of this agreement, which total sum paid hereunder is in full payment of liquidated damages rather than for the performance of personal services under said contract * * * petitioner released Great Northern from all claims, etc. *316 , under the contract and - in consideration of the payment of the aforesaid sum and the approval by the Third Party of said payment * * * in advance of the due date under said contract * * * the First Party hereby releases * * * the Second Party and/or the Third Party of and from any and all causes of action, claims, * * * that the First Party may have * * * against the Second Party and/or the Third Party as a result of the termination of said contract * * *. The agreement was signed by petitioner and by Matthias both as vice president of Great Northern and in his individual capacity. The ruling from the Bureau of Internal Revenue referred to in the above agreement was received by Great Northern in the form of a telegram on or about December 29, 1945, and read as follows: REFERENCE TELEGRAM TWENTY EIGHTH FROM THOMAS M WILKINS NO WITHHOLDING REQUIRED ON LUMP SUM PAYMENT ON JANUARY FIRST NINETEEN FORTY SIX OF REMAINING UNPAID COMPENSATION CLAIMED BY AN EMPLOYEE UNDER TWO YEAR CONTRACT IN CASE HIS SERVICES ARE TERMINATED DECEMBER THIRTY ONE NINETEEN FORTY FIVE SUCH PAYMENT TAXABLE INCOME BUT NOT WAGES TO EMPLOYEE. Petitioner did not see the telegram but was advised that Great Northern *317 had received a ruling from the Bureau of Internal Revenue that any lump-sum amount paid him under the settlement agreement would not be subject to withholding. Petitioner expressed an opinion to Matthias and the tax accountant for Great Northern that such amounts would not be income to him. Neither Matthias nor the tax accountant expressed an opinion to petitioner whether the lump-sum payment would be taxable income to petitioner. In petitioner's office at Great Northern was a Federal income tax service and a paperback desk book containing a brief summary of the rules of Federal income taxation prepared by the publisher of a commonly used income tax service. This desk book contained a statement that court decisions had held that payments made for personal injuries, including injuries to personal reputation, do not constitute income and that damages paid on account of injuries to property or breach of contract which represent merely compensation for destruction or diminution in value of capital assets are not income. The tax service contained the provisions of Regulations 115, sec. 404.101(e), to the effect that any payments made by an employer to an employee on account of dismissal *318 constitute wages subject to withholding regardless of whether the employer is legally bound by contract, statute, or otherwise to make such payments. Great Northern did not withhold Federal income tax from the amount of $15,500 stipulated to be paid petitioner in the settlement agreement, and issued its check dated December 31, 1945, to petitioner in the amount of $15,500. This check was delivered to petitioner on January 2, 1946. On December 31, 1945, petitioner had received Great Northern's check for $806.45, representing the $1,000 provided for in paragraph III of the above agreement, less withholding taxes of $183.80 and railroad retirement of $9.75. The foregoing funds received by petitioner from Great Northern were deposited to his account with the First National Bank, St. Paul, Minn., on December 31, 1945, and on January 2, 1946. Petitioner recorded the deposit of the $15,500 on his checkbook stub. The gross amount of $1,000 received on December 31, 1945, from Great Northern was reported by petitioner as taxable income in his 1945 Federal income tax return. Petitioner did not report the $15,500 received on January 2, 1946, as taxable income in his 1946 return and made no *319 mention thereof. Shortly after receiving the $15,500 petitioner invested over $16,000 in stocks, which he sold during 1946 suffering a net capital loss of $1,986.59. Petitioner did not claim any part of the loss as a deduction on his 1946 or 1947 tax returns. Petitioner received dividends on this stock in the amount of $135 during 1946 which he did not report on his 1946 return. At least a part of these dividends were not actually received by petitioner but were credited to his margin account. The above-mentioned securities were used by petitioner to secure a loan from the Citizens and Southern National Bank of South Carolina, Charleston, S.C. (hereafter referred to as Citizens and Southern). In connection with the loan, petitioner wrote a letter dated May 21, 1946, to an officer of Citizens and Southern, with which he enclosed a list of the securities. Petitioner stated in the letter: I would hate to sell any of these stocks at present, because I have a profit which would be wiped out by the capital gains provisions, and furthermore I fear I am already in the higher brackets on income for this year. After leaving the employ of Great Northern, petitioner remained in St. Paul *320 where his wife gave birth to a child in February 1946. Later petitioner moved to Charleston, S.C., where he set up a law practice. Petitioner employed a secretary from June 1946 until December 1947 who made deposits to petitioner's bank accounts and recorded the deposits in checkbooks, prepared checks to pay bills, which petitioner signed, and also kept a record of office supplies and amounts which were spent in the office. She also kept a record of some of the checks that petitioner received as fees. In May 1946 petitioner was engaged by Ashmead F. Pringle to represent him in certain income tax matters pertaining to personal and business interests. Pringle, through his corporation, paid petitioner total fees of $5,085.15, which fees were paid by check and deposited to petitioner's bank account as follows: Amount
Date of check
of check
Date of deposit
June 13, 1946
$1,500.00
June 14, 1946
Nov. 5, 1946
1,000.00
Nov. 6, 1946
Dec. 13, 1946
85.15
Dec. 14, 1946
Dec. 31, 1946
2,500.00
Jan. 3, 1947 Petitioner reported all of these amounts except the $85.15 as income on his 1946 tax return. Petitioner did not report the $85.15 as income for any year. This *321 amount was paid as reimbursement of expenses. Respondent determined that the $2,500 check dated December 31, 1946, was taxable income to petitioner in 1947. Charles R. Allen engaged petitioner as his attorney in connection with certain income tax matters. Petitioner received fees from Allen during the years 1946, 1947, and 1948 in the total amount of $8,025, all of which, except $25, was duly reported in petitioner's Federal income tax returns. These fees were paid by check and deposited to petitioner's bank accounts, except for the $25 check, which was cashed. Late in 1946 petitioner was engaged to represent Kerrison Dry Goods Co. in connection with certain income tax matters. Petitioner received a total of $5,000 in fees during 1946 and 1947 in connection with this account, all of which were paid by check and deposited in petitioner's bank account. Petitioner reported all of this amount in his tax returns for 1946 and 1947, but reported $2,000 thereof, received by check dated February 8, 1947, on his return for 1946 instead of 1947. Respondent transferred the $2,000 from petitioner's income for 1946 to his income for 1947. In 1947 petitioner was engaged to represent Corey F. *322 Rizer (hereafter referred to as Rizer) and the three corporations controlled by Rizer mentioned below in connection with income tax matters. In 1947 Olar Livestock Co. paid petitioner $2,000 by two checks and in 1948 paid him $1,125 by four checks. Respondent determined that petitioner reported all of these checks in income for the year of receipt. Petitioner claims that two checks for $250 each and one check for $500, received by him fro Olar Livestock Co. in 1948, were loans and were neither income to him in 1948 nor reported by him as income. Rizer Auto Co. paid petitioner $2,500 by three checks in 1947 and $775 by three checks in 1948. Respondent determined that all of the checks were reported by petitioner in his income for the year of receipt. Petitioner claims that two of the checks received in 1948, totaling $500, were loans and were neither income to him nor reported as such. Walterboro Motor Sales Co. paid petitioner $2,000 by three checks in 1947 and $1,000 by two checks in 1948. Respondent determined that two of the 1947 checks totaling $1,500 and one of the 1948 checks for $500 were reported by petitioner in his income for the year of receipt, and that petitioner *323 failed to report in his income one $500 check in 1947 and one $500 check in 1948. Petitioner claims that all of the checks were loans and were neither income to him for the year of receipt nor reported by him as such. When Rizer first retained petitioner he agreed to pay him $1,000 for his services, which he did by a check for $500 from each of Olar Livestock Co. and Rizer Auto Co. dated May 21, 1947. It later developed that representation of Rizer's interests entailed more work than petitioner had originally contemplated, and petitioner insisted on more money for his services. Rizer agreed to pay him an additional $3,000. The $3,000 was paid to petitioner by two checks, each in the amount of $1,500, drawn by Rizer Auto Co. and Olar Livestock Co., and each dated June 26, 1947. Later, petitioner approached Rizer's bookkeeper and asked for more money. Rizer had refused to pay him more, but the bookkeeper, who was apprehensive about a satisfactory conclusion of Rizer's tax problems, wrote checks on Rizer's corporations and delivered the checks to petitioner. Rizer did not know about any of these payments made after June 26, 1947. The bookkeeper considered the payments to petitioner *324 to have been legal fees and recorded them as such on the records of Rizer's corporations. On March 31, 1949, Rizer wrote petitioner a letter in which he recited that he had already paid petitioner $1,000 when he was first employed and an additional $3,000 on June 27, 1947, and that he would not pay him any more until the tax cases were settled. Rizer subsequently died and petitioner submitted a bill for additional fees to the executor of Rizer's estate. The "loans" were not mentioned by petitioner but the executor told petitioner he thought he had already been overpaid. However, the matter was settled by the executor agreeing to pay petitioner an additional sum of $3,000 as fees, part of which was to be applied on an indebtedness of petitioner to Olar Livestock Co. for fertilizer and mules. In connection with the Rizer cases, petitioner paid Rizer's accountant $400 for accounting fees out of the fees he collected in 1948. W. S. McCollough engaged the services of petitioner to represent him in connection with certain tax matters. During the year 1948 McCollough paid petitioner fees totaling $3,500, which petitioner reported on his Federal income tax returns for that year. Petitioner *325 paid $500 of this amount to Rogers E. Harrell, an attorney, as a forwarding fee. In 1948 petitioner was engaged by Frank H. Panegeris to represent him in certain tax matters. Panegeris paid petitioner a fee of $4,000, by check dated December 4, 1948, which was included in petitioner's income reported on his tax return for that year. Out of this amount petitioner paid $1,000 to Samuel E. Everett partially as a forwarding fee and partially in payment for accounting work. Petitioner reported his gross income from the practice of law in a lump sum on his tax returns. The parties are in disagreement as to whether three additional fees received by petitioner, one in the amount of $597 in connection with the Bailey case in 1946, one in the amount of $20 from Whilden in 1948, and the third in the amount of $1,200 from Whittemore in 1948, were included in the gross legal income reported by petitioner in each of those years. After November 30, 1936, and throughout the years 1946, 1947, and 1948, petitioner and his brother, J. L. Hartzog (hereafter referred to as J. L.), held joint legal title to a farm in Govan, Bamberg County, S.C., consisting of about 350 acres. There were eight tenant *326 houses on the property occupied during the years in controversy by sharecroppers who raised cotton on the property. J. L. also lived on the farm with his wife and three children. As the result of an automobile accident in 1931, J. L. suffered permanent damage to his skull and suffered from a condition during the years in controversy by which he was subject to recurring meningitis. J. L. was physically and mentally incompetent during the years 1946, 1947, and 1948 to earn a living for himself and family. However, he was able to do light work around the farm and could drive a truck. During the years here involved petitioner maintained bank accounts at the Bamberg County Bank and at the Edisto Bank, Denmark, S.C., in the joint names of petitioner and J. L. Petitioner made deposits to the joint accounts and J. L. wrote checks for funds for the support of himself, his wife, and his three children who were minors during the years in question. J. L. also delivered farm products to buyers and maintained an account at the Olar Livestock Co. where he charged fertilizer, and with J. W. Williamson Ginnery. He maintained some sort of ledger to show receipts from operation of the farm, at least *327 in 1947 and 1948. The record does not indicate definitely that this ledger was maintained for the year 1946. Since 1945 petitioner has borne the burden of operating the farm and claimed the full amount of all losses on the farm on his own tax returns. He relied to some extent on the ledger kept by J. L. in computing the income and expenses of the farm operation. J. W. Williamson and/or J. W. Williamson Ginnery issued checks in the total amounts of $982, $9,452.30, and $13,124.33 for cotton produced on the Govan farm during the years 1946, 1947, and 1948, respectively. All checks issued in 1946 and 1947 were made payable to J. L., and all checks except two were made payable to J. L. in 1948. Two checks in 1948 were payable to petitioner. These two checks totaled $2,057.28. Petitioner received checks aggregating $6,975.13 from the Carolina Cotton Co., Inc., Columbia, S.C., during the year 1948. This amount, less bank charges of $20.40, represents the net proceeds from Commodity Credit Corp. loans for cotton deposited in 1948 as collateral security for the loans. Petitioner could have redeemed the cotton deposited as security for these loans until July 15, 1949. If not redeemed, *328 the Government sold the cotton in the pool and credited the borrower's share of the proceeds of sale against his loan, paying any excess to the borrower. Petitioner did not redeem the cotton he deposited as security in 1948. In preparing his tax returns for the years here involved petitioner relied to some extent on the records kept by his office secretary for his income and expenses from the practice of law, and to some extent on the records kept by J. L. for the farm income and expenses. He prepared rough drafts of the returns and sent them to a friend in Washington, D.C., who was employed in the Bureau of Internal Revenue. The friend looked them over and at times made suggestions, computed the tax thereon, and returned them to petitioner, who had them typed and then signed and filed them. Petitioner did not send supporting data to his friend, and petitioner did not tell his friend about the $15,000 he received from Great Northern in 1946. On January 9, 1950, special agent Berlin and deputy collector Baynard contacted petitioner at his office in Charleston, S.C. They told him they had his returns for 1946, 1947, and 1948 for examination. Petitioner recognized the special agent, *329 and said that he would have to contact his attorney in Washington, D.C., about what he recognized as a potential joint investigation. As the result of requests by petitioner, the special agent was instructed not to particirate actively in the examination of petitioner's returns. He was not withdrawn from the case, but he was instructed not to contact third parties until it could be determined from an audit of petitioner's books and records by the deputy collector whether the examination could be completed without active participation by the special agent. Petitioner apparently gave his canceled checks and what books and records he had to the deputy collector, pursuant to the agreement that the special agent would not actively participate in the audit, but the special agent concluded that his active participation in the case was warranted, and he contacted petitioner on March 1, 1950, with respect to the payment received from Great Northern. Petitioner told him that the general counsel and tax accountant of Great Northern, as well as several former associates of petitioner in the Office of the Chief Counsel, Bureau of Internal Revenue, had told him that, in their opinion, the payment *330 received in 1946 was nontaxable. Petitioner also took the position that the payments were nontaxable because they were for damages. He stated that he had citations to court decisions which would uphold his contentions. As the result of the joint investigation petitioner was indicted for willful attempt to evade and defeat income tax for the years 1946, 1947, and 1948, with the results heretofore set out. Respondent's determination in the notice of deficiency is based primarily on the audit of the deceased deputy collector and the results of the joint investigation, including some independent findings of the special agent. At the trial of this case the parties submitted in evidence a rather complete stipulation of facts, which had attached as exhibits the bill of particulars filed by the Government in the criminal tax evasion case referred to above, an audit of petitioner's books and records and his income and expenses for the years involved prepared by petitioner's accountants and received in evidence in the criminal case, and the stenographic transcript of the entire proceedings in the criminal case (consisting of 673 pages). Respondent offered no witnesses at the trial of this *331 case, and petitioner offered only the testimony of himself and the testimony of special agent Berlin, which was limited to showing that Berlin had prepared the bill of particulars almost entirely from the workpapers of deputy collector Baynard, and that Berlin had not personally examined petitioner's books and records nor classified his income and expenditures. Without reciting the details, a summary of petitioner's income and deductible expenditures, and his net income, as reflected on petitioner's returns, on the bill of particulars, and on the audit prepared by petitioner's accountants is as follows: 1946
Bill of
Return
particulars
CPA audit
Legal fees
$ 9,500.00
$ 5,785.15
$ 5,785.15
Less - Expenses: Salaries and wages
1,800.00
946.35
946.35
Interest
210.00
0
0
Other expenses
2,359.00
1,928.68
3,902.60
Total expenses
$ 4,369.00
$ 2,875.03
$ 4,848.95
Net profit from practice of law
$ 5,131.00
$ 2,910.12
$ 936.20
Farm receipts: Cotton
$ 525.00
$ 982.00
$ 525.00
Other
2,150.00
2,150.00
2,150.00
Total
$ 2,675.00
$ 3,132.00
$ 2,675.00
Less: Farm expenses
7,248.00
5,480.48
5,610.95
Farm loss
($4,573.00)
($2,348.48)
($2,935.95)
Dividends
0
135.00
135.00
Great Northern payment
0
15,500.00
0
Loss on sale of securities
0
(1,000.00)
(1,000.00)
Adjusted gross income
$ 558.00
$15,196.64
($2,864.75)
Less: Itemized deductions
2,817.32
1,876.82
1,890.67
Net income
($2,259.32)
$13,319.82
($4,755.42)
1947
Legal fees
$13,500.00
$18,525.00
$17,178.15
Less - Expenses: Rent
924.00
924.00
924.00
Salaries and wages
1,800.00
1,748.65
1,748.65
Other
2,470.46
1,874.33
4,746.32
Total expenses
$ 5,194.46
$ 4,546.98
$ 7,418.97
Net profit from practice of law
$ 8,305.54
$13,978.02
$ 9,759.18
Farm receipts: Cotton
$ 5,400.00
$ 9,748.93
$ 9,452.30
Other
3,525.00
3,496.52
3,496.52
Total
$ 8,925.00
$13,245.45
$12,948.82
Less: Farm expenses
17,305.44
16,627.28
20,342.01
Farm loss
($8,380.44)
($3,381.83)
($7,393.19)
Loss on sale of securities
0
(986.59)
(986.59)
Adjusted gross income
$ (74.90)
$ 9,609.60
$ 1,379.40
Less: Itemized deductions
1,127.33
949.06
1,274.84
Net income
($1,202.23)
$ 8,660.54
$ 104.56
1948
Legal fees
$ 9,000.00
$10,700.00
$ 8,700.00
Less - Expenses: Rent
924.00
554.00
554.00
Salaries and wages
2,400.00
1,021.02
1,418.70
Other
1,960.00
1,572.91
4,351.67
Total expenses
$ 5,284.00
$ 3,147.93
$ 6,324.37
Net profit from practice of law
$ 3,716.00
$ 7,552.07
$ 2,375.63
Farm receipts: Cotton
$ 9,200.00
$20,539.33
$13,584.60
Other
1,000.00
1,342.48
1,123.98
Total
$10,200.00
$21,881.81
$14,708.58
Less: Farm expenses
14,527.55
18,002.29
19,123.29
($4,327.55)
$ 3,879.52
($4,414.71)
Adjusted gross income
(611.55)
11,431.59
(2,039.08)
Less: Itemized deductions
1,264.33
1,270.38
1,593.91
Net income
($1,875.88)
$10,161.21
($3,632.99)
*332 In his notice of deficiency respondent added to petitioner's income, as shown on the bill of particulars above, the following items: 1946
1947
1948
Unidentified checks
$930.52
$311.37
$2,630.57
Additional legal fees
1,520.00
Contributions disallowed
773.00
292.00
173.00
Error in addition on neturn
1.32
Petitioner's returns for the taxable years 1946, 1947, and 1948 were not false and fraudulent with the intent to evade tax. Opinion We are concerned with deficiencies in petitioner's income taxes determined by respondent for the years 1946, 1947, and 1948. The assessment and collection of any deficiency for each of those years is barred by the statute of limitations, sec. 275, I.R.C. 1939, unless petitioner's returns for those years were false or fraudulent with intent to evade tax, sec. 276(a), I.R.C. 1939. The burden of proving that petitioner's returns were false or fraudulent with intent to evade tax rests upon respondent, sec. 1112, I.R.C. 1939, who must prove fraud by clear and convincing evidence. Fraud implies bad faith, intentional wrongdoing, and a sinister motive. The existence of fraud must be affirmatively established *333 by respondent. Mere suspicion of fraud and mere doubts as to the intentions of the taxpayer are not sufficient proof of fraud. I. Glenn Switzer, 20 T.C. 759 (1953); Luerana Pigman, 31 T.C. 356 (1958). Fraud is not established by the mere understatement of taxable income, L. Glenn Switzer, supra, although consistent and large understatements of income may constitute substantial evidence of fraud. Arlette Coat Co., Inc., 14 T.C. 751 (1950). We are not convinced by the evidence presented in this case that respondent has carried his burden of proving fraud. The evidence consisted of a stipulation of facts, the pertinent parts of which we included in our findings of fact, and the oral testimony of petitioner. Although special agent Berlin was called as a witness by petitioner, his testimony was only to the effect that his testimony in the criminal trial was based almost entirely on the workpapers of Baynard, who was dead at the time of the trial, and that he had not personally examined petitioner's books and records. The stipulation filed by the parties had attached to it as exhibits copies of the entire transcript of the criminal *334 trial, the bill of particulars filed by the Government therein, and the summary of tax information prepared by petitioner's accountants from petitioner's books and records, but it was supulated only that the exhibits were copies of the documents mentioned. Nothing was said as to how these documents should be used in this case. However, it seems rather apparent from statements of counsel both at the trial of this case and in the briefs that the parties intended that the documents and the testimony of witnesses recorded in the transcript of the criminal trial be used as evidence in this case, subject to the objections made therein and to certain objections stated at the trial of this case. Consequently, we have given consideration to the testimony of witnesses contained in the transcript, where we thought it was admissible evidence, except for the testimony of Berlin based on Baynard's workpapers, the admission into evidence of which in the criminal trial was the basis for the reveral and remand of that case by the Court of Appeals. We add that the conclusion we reach would be no different even if we ignored the evidence presented in the criminal case; and this is so despite the fact *335 that we have been able to place very little reliance on petitioner's testimony. Without the evidence from the former trial respondent has offered no affirmative evidence of fraud except his determinations in his notice of deficiency, which in our opinion do not of themselves present such a picture of deliberate and consistent understatements of income as to support a finding of fraud. Realizing that under the ruling of the Court of Appeals in the criminal case, he could not rely on Berlin's testimony based on the deceased Baynard's workpapers as proof of fraud, respondent on brief specifically states that he does not rely on petitioner's alleged overstatements of expenses to prove fraud, but relies solely on specific understatements of income, coupled with evidence of fraudulent intent, to support his charge of fraud. In this regard we must note, however, that petitioner's books and records from which petitioner's accountants made their audit, and presumably from which Baynard worked, were said to be in the courtroom or available at the trial of both this case and the criminal case, but were not offered in evidence. We are of the opinion that the presence of these books and records *336 in the courtroom lays a foundation for consideration of the summaries thereof made by petitioner's accountants and received in evidence in the criminal trial. Respondent relies primarily on petitioner's failure to report the $15,500 payment received from Great Northern in 1946, and petitioner's alleged failure to report certain legal fees and sales of farm products, principally cotton, to prove fraud. We need not determine, in this connection, whether the payment made to petitioner by Great Northern constituted taxable income to him, but only whether petitioner deliberately omitted it from his tax return, knowing or having good reason to believe that it was taxable income, with the intent of evading tax thereon. There can be no question that petitioner consistently took the position that the payment was not taxable to him because it represented liquidated compensatory damages for injury to his health and reputation and/or breach of contract. He so advised the officers of Great Northern at the time the payment was made. He had some support for this position from the fact that respondent's regulations, sec. 404.101(e), Regs. 115, provided in effect that dismissal payments made *337 by an employer to an employee constituted wages subject to withholding, coupled with the fact that respondent had specifically ruled that Great Northern need not withhold on the lump sum paid to him in 1946. In addition the form of the release agreement itself lends some support for petitioner's contention. The payment was stated to be in payment of liquidated damages rather than for performance of personal services under the employment contract; and the terms of the release were perhaps broader than necessary. Furthermore, the general counsel for Great Northern, who had fired petitioner, was made a party to the release which indicates he may have been apprehensive about any personal liability he may have incurred with respect to petitioner. It is apparent that the amount paid was equal to the amount petitioner would have been paid had the contract been fully performed, but this does not necessarily characterize what the payment was for. Respondent's contention that petitioner deliberately concealed this payment knowing that it was taxable, evidence by his failure to even mention it on his return and his failure to report dividends from, and losses on the sale of, stocks in which *338 he invested the money, are mere suspicions which are hard to accept when viewed in the light of other factors. Petitioner immediately deposited the payment in his bank account and bought publicly held stocks with it through a brokerage office. For all petitioner knew Great Northern might have mentioned his name when requesting the ruling on withholding from the payment. It hardly seems likely that petitioner had hopes of concealing this payment in the light of such circumstances. We have only petitioner's testimony as evidence of his intent with respect to this item. It is true that the telegram ruling also stated that the payment was taxable to the employee, but it is clear from the testimony of the Great Northern officers in the criminal trial, as well as petitioner's own testimony, that petitioner was not shown the telegram and was not advised of the second part of the ruling. While we have some doubts about the sincerity of petitioner's belief that this payment was not taxable to him, and while we agree with respondent that it would have been better under the circumstances for petitioner to report the item on his return and claim that it was nontaxable, we know of no rule that *339 required him to do so, and we do not think the evidence as a whole is sufficiently clear and convincing that petitioner's failure to report this item was a deliberate attempt to evade tax on income that he knew or should have known was taxable to him. We note in passing that the jury in the criminal case apparently accepted petitioner's explanation of this item because it found him not guilty of fraud for the year 1946. Respondent also contends that petitioner fraudulently omitted legal fees from gross income and that he fraudulently claimed deductions for "forwarding fees" which were in fact payments made by petitioner in accordance with fee-splitting arrangements which were illegal under the laws of South Carolina. With respect to the "forwarding fees" we have very little evidence concerning them. Petitioner admits making the payments but claims they were for accounting and legal work. The recipients of them were not called as witnesses. We find no specific deduction of them on the returns; nor do we have any evidence that they were deducted by petitioner prior to entering the amount of gross income from his legal practice on his returns. We cannot even tell from the record whether *340 these payments would have been in violation of South Carolina law. It would not be unusual for a tax attorney to pay another attorney or an accountant for professional assistance in handling tax matters and we cannot conclude on this evidence that such payments by petitioner were acts of fraud. With respect to the alleged omission of legal fees from gross income, again the record is far from clear. Petitioner reported legal fees received as a lump sum, and there is no evidence showing the source of these fees. For the year 1946 petitioner overstated the amount of legal fees received according to both respondent's bill of particulars and petitioner's accountants. Respondent claims this resulted from petitioner's inclusion in 1946 gross income of one check dated December 31, 1946, for $2,500 from Pringle, and one check dated February 8, 1947, from Kerrison Dry Goods Co., which petitioner did not receive until 1947 and should have included in his 1947 income, which respondent has done. If these are climinated from the legal income petitioner reported for 1946, it becomes apparent, claims respondent, that petitioner failed to report a fee of $700 received from Bailey in 1946, and $85.15 *341 of the total $5,085.15 payment received from Pringle in 1946. The Bailey matter resulted in a division of an insurance company check among the client, two doctors, a hospital, and petitioner, and we have no way of knowing whether petitioner's share was included in the legal fees he reported. It appears from the record that the $85.15 check separately issued by Pringle was for reimbursement of expenses. Whether this was handled properly by petitioner we do not know but we do not consider it evidence of fraud. The legal fees alleged to have been omitted in 1947 and 1948 involve primarily certain payments received by petitioner from Rizer and/or corporations controlled by him. Petitioner apparently received a total of $6,500 from this source in 1947 and a total of $2,900 from this source in 1948. The payments were made by various checks drawn on the three Rizer companies at various times. Respondent claims that petitioner included in his legal fees reported on his returns all of these payments except a check for $500 drawn on Walterboro Motor Sales Co. in 1947 and a check in the same amount drawn on the same company in 1948. On the other hand, petitioner claims that Rizer only agreed *342 to pay him $4,000 prior to termination of the cases, that the amounts he received over and above that amount were loans from the various companies made by Rizer's bookkeeper to enable petitioner to continue work on the cases, and that he did not include this excess in legal fees reported by him on his returns for 1947 and 1948. This rather unusual turnabout in the arguments of the parties results from respondent's apparent attempt to prove that specific fees were omitted by showing what fees were included to make up the total fees reported by petitioner in a lump sum on his returns for those years. Petitioner reported $13,500 in legal fees for 1947, while respondent claims he actually received $18,525 in legal fees. $4,500 of this difference is represented by the two checks heretofore mentioned which petitioner reported in 1946 rather than 1947. Respondent claims the remaining difference $525of represents $25 of the $5,025 fee paid petitioner by Allen and one $500 check paid petitioner by Walterboro Motor Sales Co. How respondent arrived at this conclusion we do not know. Petitioner's accountants arrived at a figure of $17,178.15 as legal fees received by petitioner in 1947. There *343 is evidence that the $25 check was cashed rather than deposited in petitioner's bank account and it was probably a reimbursement of expenses anyway. It may be that petitioner's bookkeeper inadvertently failed to record one or two of the checks received by petitioner from the Rizer corporations. It seems rather unlikely, however, that petitioner would deliberately omit two of these checks from income and report all the rest when all of the Rizer checks were deposited in his bank account. Petitioner reported $9,000 in legal fees in 1948, while respondent, in his notice of deficiency, claims that he received $12,220 in fees. The latter figure is approximately $1,520 more than shown by respondent on his bill of particulars but we cannot tell from the evidence wherein lies the difference. Petitioner's accountants reported that petitioner's books reflected a total of $8,700 in fees received. As previously mentioned petitioner's books were not offered in evidence and we do not know what specific fees were included in the $9,000 in fees reported by petitioner. On brief respondent indicates that $1,500 of the $3,220 in legal fees claimed to have been unreported in 1948 represents forwarding *344 fees disallowed as previously mentioned. This leaves $1,720 comprised, according to respondent, of $500 from Walterboro Motor Sales Co., $20 from Whilden, and $1,200 from Whittemore, that was unreported. Petitioner claims that all except the $500 Walterboro Motor Sales Co. fee was included in his legal income reported, and he has an explanation for that which the evidence as a whole does not refute. We have no doubt that petitioner was negligent in not keeping better records or having them kept for him, and that he manufactures explanations whenever he thinks they are needed, but our doubts about some of petitioner's testimony cannot serve as affirmative evidence to support respondent's case. We cannot find from the evidence as a whole that petitioner fraudulently omitted specific legal fees from the legal fees he reported. Finally, respondent contends that petitioner fraudulently omitted receipts from the sale of cotton from his farm. Petitioner's brother, possibly in conjunction with petitioner or with his wife, maintained some sort of ledgers for recording farm receipts. This ledger was available to respondent at the trial of this case but was not offered in evidence. Absent *345 the ledger we cannot determine what receipts from the sale of cotton were omitted from petitioner's returns. It is petitioner's contention that he only reported one-half of the receipts from cotton sales because sharecroppers on his farm were entitled to the other one-half of the receipts. In this connection he vigorously maintains that he did not deduct advances which he made to the sharecroppers but instead applied their share of the receipts from cotton sales against these advances. In each of the years 1946, 1947, and 1948 respondent's bill of particulars includes greater receipts from the sale of cotton than reported by petitioner. The summary prepared by petitioner's accountants does too, except for the year 1946 when they found no records of cotton sales and simply adopted petitioner's figures. But in all 3 years both respondent's bill of particulars and the accountants' summary also reflect considerably more for expenses of labor hired than claimed by petitioner on his returns. This tends to support petitioner's contention that he was netting these two items on his returns. The prinicpal item wherein respondent and petitioner's accountants differ was the amount of $6,954.73 *346 petitioner received in 1948 from the Commodity Credit Corp. as loans. Without including this amount in receipts there would have been a net farm loss in about the amount claimed by petitioner on his return for 1948 instead of the net profit of $3,879.52 determined by respondent. Petitioner claims that these loans were not includable in income until the transactions were closed and the cotton deposited by petitioner as collateral security for the loans was sold by the Government. Respondent agrees with this contention unless petitioner elected to report at least a part of it in income for 1948, which respondent claims petitioner did. See sec. 123, I.R.C. 1939.[2] But respondent's only proof that petitioner elected to have these loans considered as income for the year in which received was an effort to show that petitioner did not report the loans as cotton sales in 1949, when respondent claims the Government pooled and sold the cotton, so he must have reported it in 1948. Needless to say, even if there was evidence to support respondent's contention, it would not prove that petitioner elected to include the loans in income for 1948. We note in passing that the Court of Appeals, in its *347 opinion in the criminal case, Hartzog v. United States, 217 F. 2d 706 (C.A. 4, 1954), stated its view that the amount of the cotton loans made by the Commodity Credit Corp. was not income to petitioner in 1948. While this statement was not necessary because of the reversal and remand of the case on evidentiary grounds, it was clearly a point that was relied on by petitioner on the appeal and argued by the parties. At least it supports petitioner's stated belief that the loans were not includable in his income for 1948, which is what we are more concerned with on the fraud issue. It would unreasonably prolong this opinion and would be of no benefit to discuss in detail respondent's other arguments that fraud has been proven, such as petitioner's alleged failure to keep proper records and to cooperate with the investigating agents, and his misrepresentations and evasive testimony on the witness stand. Suffice it to say *348 that we do not think the evidence as a whole, which we have examined in detail, presents the clear and convincing proof required to carry respondent's burden of proving fraud, and we have therefore found as an ultimate fact that the returns were not fraudulent. It not having been proved that petitioner's returns for any of the years 1946, 1947, and 1948 were false and fraudulent with intent to evade tax, assessment and collection of any deficiencies for any of those years is barred by the statute of limitations. Consequently, we need not consider the other issues, and Decision will be entered for the petitioner. Footnotes
1. All statutory references are to the Internal Revenue Code of 1939 unless otherwise indicated.↩
2. SEC. 123. COMMODITY CREDIT LOANS. (a) Amounts received as loans from the Commodity Credit Corporation shall, at the election of the taxpayer, be considered as income and shall be included in gross income for the taxable year in which received.↩